[No. B091212. Second Dist., Div. Five. Dec. 8, 1995.]

MARK J. FENNING, Plaintiff and Appellant, v.
GLENFED, INC., et al., Defendants and Respondents.

**COUNSEL**

Chimicles, Jacobsen & Tikellis, Patrick J. Grannan, Robin B. Howald, Marc A. Seligman, Kramer & McShane and Philip A. Kramer for Plaintiff and Appellant.

Irell & Manella, Sheldon Eisenberg and Daniel A. Saunders for Defendants and Respondents.

**OPINION**

**ARMSTRONG, J.**—Plaintiff Mark J. Fenning appeals from a judgment dismissing his class action complaint[1] after demurrer by defendants Glendale Federal Bank, its former and current parent companies, and its securities brokerage subsidiary. We reverse.

FACTS

Glendale Federal Bank (the Bank) is a federally chartered savings and loan association organized and operating under the Home Owners' Loan Act

---

[1] The class had yet to be certified.

of 1933 (HOLA), as amended, 12 United States Code section 1461 et seq. The Bank is federally insured by the Federal Deposit Insurance Corporation (FDIC), and federally regulated by the Office of Thrift Supervision (OTS, formerly known as the Federal Home Loan Bank Board). Glendale Brokerage Services, Inc., doing business as Glenfed Brokerage Services (Glenfed Brokerage), is a wholly owned subsidiary of the Bank, organized and existing under the laws of the State of California. As such, it is a "service corporation" within the meaning of the HOLA regulations. (12 C.F.R. § 545.74 (1995).) A member of the National Association of Securities Dealers, Glenfed Brokerage provides securities brokerage and investment advisory services. Glenfed, Inc., and Glendale Investment Corporation are, respectively, the former and current holding companies of the Bank.

In his complaint, plaintiff alleges that he walked into a branch office of the Bank where he maintained a checking account, seeking to reinvest the proceeds of a certificate of deposit from his pension and employee benefit plans. After explaining his investment objectives to an "investment consultant" whom he believed to be a Bank employee, he was persuaded to invest his money in two mutual funds, neither of which was FDIC insured. Plaintiff first learned that his investment was not with the Bank, and not FDIC insured, when he received his first quarterly account statement, which reported an investment loss.

Plaintiff filed this class action suit against defendants, alleging causes of action for unfair and deceptive business practices in violation of California Business and Professions Code sections 17200 and 17500,[2] fraud, and negligent misrepresentation. The gravamen of the complaint is that the

---

[2]Business and Professions Code section 17500 provides in pertinent part: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised. . . ."

Business and Professions Code section 17200 defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."

advertising and sales practices of Glenfed Brokerage purposefully deceive customers by blurring the distinction between the Bank, whose investment products are safe and federally insured, and Glenfed Brokerage, which sells uninsured investments subject to substantial risks of loss, in order to induce customers to purchase investment products from Glenfed Brokerage. Plaintiff maintains that these advertising and sales practices are unfair and deceptive business practices. Plaintiff also alleges that these business practices are in direct violation of federal regulations applicable to service corporations such as Glenfed Brokerage. Moreover, plaintiff maintains that the Bank is separately liable for this conduct because, by means of the improper and misleading use of the Bank's personnel, logo, and facilities to sell securities, the Bank, in effect, actively engaged in consumer fraud.

Defendants demurred to the complaint, asserting that plaintiff's claims are preempted by HOLA, and specifically by 12 Code of Federal Regulations section 545.2 (1995), which provides that "The regulations in this part 545 are . . . preemptive of any state law purporting to address the subject of the operations of a Federal savings association." The trial court sustained defendants' demurrer on that basis, and dismissed the complaint. Plaintiff appeals. We reverse the judgment, finding that the state law causes of action against the defendants are not preempted by HOLA or its implementing regulations.

## Contentions

Plaintiff contends that the trial court erred in dismissing his complaint, urging that (1) although a state may not regulate the "operations" of a federally chartered savings association, plaintiff's claims against the Bank do not implicate its "operations" as a savings association; (2) the activities of a subsidiary service corporation are not "operations" of the parent association so as to be precluded from state regulation; and (3) neither Congress nor the OTS has manifested any intent to subject the entire field of service corporations to exclusive federal regulation.

## Federal Preemption

Under the supremacy clause of the United States Constitution (art. VI, cl. 2), federal law preempts state law where Congress so intends. (*Fidelity Federal Sav. & Loan Assn.* v. *de la Cuesta* (1982) 458 U.S. 141, 153 [73 L.Ed.2d 664, 675, 102 S.Ct. 3014] [hereafter *de la Cuesta*].) Federal regulations enacted pursuant to a grant of authority by Congress are entitled to the same preemptive effect as are federal statutes. (*Id.* at p. 154 [73 L.Ed.2d at pp. 675-676].) Since *M'Culloch* v. *State of Maryland* (1819) 17 U.S. (4 Wheat) 316 [4 L.Ed. 579], the United States Supreme Court has

consistently held that federal preemption of state laws requires a clear congressional intent. Thus, preemption exists only where there is a " 'clear and manifest purpose of Congress' " to foreclose a particular field to state legislation. (*Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 614, 97 S.Ct. 1305], quoting *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146].)

Congressional intent to preempt state law may be established in one of three ways. First, Congress may expressly state that the field is preempted. (*California Federal S. & L. Assn.* v. *Guerra* (1987) 479 U.S. 272, 280 [93 L.Ed.2d 613, 622-623, 107 S.Ct. 683].) Second, congressional intent will be inferred where the regulatory scheme is " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it' " or where " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " (*De la Cuesta, supra,* 458 U.S. 141, 153 [73 L.Ed.2d 664, 675].) Whether state laws are preempted expressly or by implication, all state law in the field, whether conflicting or consistent with federal law, is preempted. (*KVUE, Inc.* v. *Austin Broadcasting Corp.* (5th Cir. 1983) 709 F.2d 922, 931, affd. (1984) 465 U.S. 1092 [80 L.Ed.2d 114, 104 S.Ct. 1580].) Finally, even in the absence of express or implied preemption of all state regulation in a given area, ". . . state law is nullified to the extent that it actually conflicts with federal law." (458 U.S. at p. 153 [73 L.Ed.2d at p. 675].)

## HOLA REGULATIONS

With the foregoing principles in mind, we review the regulatory scheme governing federal savings and loan associations such as the Bank.

In HOLA, Congress created a system of federal savings and loan associations to be regulated by the Federal Home Loan Bank Board (the Bank Board).[3] Pursuant to its broad statutory authorization, the Bank Board "has promulgated regulations governing 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave. . . .' " (*De la Cuesta, supra,* 458 U.S. 141, 145 [73 L.Ed.2d 664, 670], citation omitted.)

In 1983, the Bank Board promulgated 12 Code of Federal Regulations section 545.2 (1995) to codify the preemptive effect of the Board's regulations. That section provides: "The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Office to

---

[3]In 1989, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act, which amended HOLA by, among other things, dissolving the Bank Board and creating the OTS in its place. (12 U.S.C. §§ 1462a-1464.)

regulate all aspects of the operations of Federal savings associations, as set forth in section 5(a) of the [Home Owners' Loan] Act [of 1933, 12 United States Code section 1464, as amended.] This exercise of the Office's authority is preemptive of any state law purporting to address the subject of the operations of a Federal savings association." (12 C.F.R. § 545.2 (1995).)

Section 545.74 of 12 Code of Federal Regulations, entitled "Service corporations," authorizes and regulates a savings association's activities with respect to commercial enterprises other than residential lending. Thus, the regulations permit an association to "invest in service corporations organized under the laws of the state . . . in which the association's home office is located, . . ." (12 C.F.R. § 545.74(b) (1995).) Among the activities in which a service corporation may engage are residential, consumer, educational, and commercial lending (12 C.F.R. § 545.74(c)(1)); financial services (such as credit analysis, escrow, and internal auditing services) (12 C.F.R. § 545.74(c)(2)); real estate services (including real property management, relocation and real estate brokerage services) (12 C.F.R. § 545.74(c)(3)); securities brokerage services (12 C.F.R. § 545.74(c)(4)); and insurance brokerage services (12 C.F.R. § 545.74 (c)(6)).

The regulations governing a securities brokerage service corporation such as Glenfed Brokerage provide that the service corporation must conduct such activities "in an area that is clearly identified and distinguished from the areas where the association's depository functions are performed" (12 C.F.R. § 545.74(c)(4)(A) (1995)), and that the service corporation must distinguish between its advertising and that of the association's "such that advertising does not confuse securities transactions executed, securities purchased, or investment advice provided by the service corporation with the federally-insured deposits" and must ensure "that the advertising indicates that the service corporation and broker-dealer, and not the association, is providing the securities brokerage or investment advisory services, identifies the broker-dealer in advertising, and does not use the logo of the parent association in the text of any advertisement prepared or distributed by the service corporation . . . ." (12 C.F.R. § 545.74(c)(4)(B) (1995).) As noted, the complaint alleges violation of these precise regulations as one of the bases for the unfair business practices cause of action.

## DISCUSSION

Plaintiff sued both the Bank, a federal savings association, and three affiliated companies, none of which is a federal savings association. Consequently, we must make independent determinations of whether Congress intended to preempt plaintiff's claims against the Bank and the other

defendants. We begin with a discussion of Glenfed Brokerage, the service corporation wholly owned by the Bank.

### 1.  *Claims Against Glenfed Brokerage*

Our research has revealed but three cases which discuss the issue of federal preemption of state law claims against service corporations. In the first case, a 1988 lawsuit before the United States District Court for the Northern District of Illinois, the defendant federal savings association advanced an argument similar to that of defendants here. There, the plaintiffs alleged state law claims for unfair and deceptive business practices in connection with an unlawful referral and kickback relationship between a federal savings association, its title insurance service corporation, and Chicago Title Insurance Company. The defendants contended that, because the federal association was chartered under HOLA, plaintiffs' state law claims were preempted by federal law. The District Court replied, in dicta: "The regulations [governing service corporations] relied upon by defendants do no more than authorize investment in service organizations providing title insurance. We cannot conclude from this that Congress intended for such organizations to operate wholly exempt from the trade laws governing their competitors simply because they happen to be financed by a savings and loan." (*Mid America Title Company* v. *Chicago Title Insurance Company* (U.S. Dist Ct., N.D.Ill.) 1988, No. 88C5864.)

Next, in *THM, Ltd.* v. *Commissioner of Ins.* (1989) 176 Mich.App. 772 [440 N.W.2d 85], the Court of Appeals of Michigan considered the contention that the federal grant of authority, pursuant to 12 Code of Federal Regulations section 545.74 (1995), for a federal savings association to engage in insurance agency activities preempted state decisions as to licensure and regulation of an insurance service corporation. The court rejected this argument: "Although the regulation granted permissive authority for savings and loan associations to engage in insurance activities, such activities were intended to be subject to state licensure and regulation. Therefore, there is no federal preemption because the scheme of federal regulation is not so pervasive as to lead to a reasonable inference that Congress left no room for the states to supplement it." (440 N.W.2d at p. 92.)

Finally, the Illinois Court of Appeal dealt squarely with the preemptive effect of the HOLA regulations with respect to service corporations in *Spitz* v. *Goldome Realty Credit Corp.* (1991) 210 Ill.App.3d 215 [155 Ill.Dec. 43, 569 N.E.2d 43], affd. (1992) 151 Ill.2d 71 [175 Ill.Dec. 727, 600 N.E.2d 1185].) In *Spitz*, plaintiffs secured a home mortgage loan from defendant Goldome Realty Credit Corp. (Goldome Credit), a wholly owned subsidiary

service corporation of Goldome Secondary Markets, Inc., which in turn was a wholly owned subsidiary of Goldome Federal Savings Bank, a federally chartered savings association. Plaintiffs' class action complaint alleged that Goldome Credit violated the Illinois Mortgage Escrow Account Act by failing to notify plaintiffs of their rights under the escrow provisions of that act. Goldome Credit contended that the claim was preempted by the HOLA regulations, and won a dismissal in the trial court on that basis.

On appeal, the Court of Appeal acknowledged that "There is no question that the doctrine of preemption applies with respect to the parent corporation; . . . nor do the parties dispute that there is exclusive federal regulation of federally chartered savings associations and that the Bank Board has the exclusive and plenary power to 'regulate all aspects of the operations of Federal associations.' . . . At issue is whether the preemption that applies to the parent federal savings associations is applicable to the state chartered subsidiary service corporation." (*Spitz* v. *Goldome Realty Credit Corp.*, *supra*, 569 N.E.2d 43, 46, citations omitted.) The court concluded that Congress had evidenced no intention to preempt state law with respect the operations of a service corporation. Rather, the regulations concerning service corporations, 12 Code of Federal Regulations section 545.74 (1990), reflect a contrary intent, that federal regulations supplement, rather than preempt, existing laws governing the conduct of service corporations.

■ After noting that HOLA regulations mandate that a majority of the service corporation's common stock be owned by one or more federal savings associations (12 C.F.R. § 561.45 (1990)), govern the investment of parent associations in their subsidiary service corporations (12 C.F.R. § 563.98 (1990)), and vest in the Bank Board discretion to circumscribe the permitted activities of service corporations (12 C.F.R. § 545.74(b)(4) and (c) (1990)), the court stated: "While service corporations are subject to federal regulation in other areas as well as those described above, neither Congress nor the Bank Board has manifested any intention to preempt the entire field of service corporation activities. Although Congress has set limitations on how federally chartered associations may invest in service corporations, (12 U.S.C. sec. 1464(c)(4)(B) (1987)), no federal statute exists specifically precluding state regulation of service corporations. In fact, service corporations are state chartered and must be organized under the laws of the state in which their parent association's home office is located. (12 U.S.C. sec. 1464(c)(4)(B) (1987).) Moreover, while the Bank Board does regulate service corporations in some areas, such regulation is selective and sporadic. . . . Therefore, it does not appear that the Bank Board, based on the explicit content of its regulations or on its pattern of regulatory activity, has indicated any intent to preempt any state regulation of service corporations." (*Spitz* v. *Goldome Realty Credit Corp.*, *supra*, 569 N.E.2d at p. 47.)

We find the foregoing reasoning compelling. By incorporating a service corporation under the laws of the state of the home office of the association, federally regulated savings associations are permitted to engage in fields of commerce, such as real estate and insurance brokerage, traditionally subject to state law. Had Congress intended to preempt service corporations engaged in these fields from the state laws to which their competitors are subject, it would have done so in clear and explicit terms, as it did with respect to savings associations. Moreover, preemption cannot be implied where, as here, there is scant regulation of service corporations, as opposed to a regulatory scheme that is " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " (*De la Cuesta, supra,* 458 U.S. 141, 153 [73 L.Ed.2d 664, 675].) "An intent to preempt without providing a comprehensive regulatory scheme could lead to the intolerable result of permitting service corporations to perform . . . activities, which are traditionally highly regulated, unfettered by any regulation." (*Spitz* v. *Goldome Realty Credit Corp., supra,* 569 N.E.2d 43, 48, italics omitted.)

This conclusion is bolstered by the Bank Board's stated position on the subject in a series of opinion letters.[4] In 1985, general counsel to the Bank Board stated in an opinion letter that the Bank Board held no position regarding the applicability of the preemption regulation (12 C.F.R. § 545.2) to service corporations. (Fed. Home Loan Bank Bd. Opn. Letter (Aug. 13, 1985).) The following year, general counsel to the Bank Board opined, with respect to a Wisconsin law setting forth notice of relationship requirements, that while the state law was preempted by federal law as it related to federal savings associations, it was not preempted with respect to subsidiaries or affiliates of federal associations which are not themselves federal associations. (Fed. Home Loan Bank Bd. Opn. Letter (Sept. 16, 1986).)

In 1988, the Bank Board's deputy general counsel addressed at length the very issue posed in this case. In that letter, the Bank Board disclaimed any intention to preempt any state regulation of service corporations. Deputy general counsel stated that "neither Congress nor the Bank Board has expressed an intent to preempt state law by occupying the field with regard to the service corporations of federal associations. In this regard, it is contemplated that there would be a system of dual federal and state regulation." (Fed. Home Loan Bank Bd. Opn. Letter (Nov. 21, 1988).) The

---

[4]While such letters from an administrative agency are not binding authority, they may be persuasive (*Skidmore* v. *Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 129, 65 S.Ct. 161]), and may be deferred to when the issue is not governed by clear expression in the statute. (*Securities Industry Ass'n.* v. *Fed. Home Loan Bank Bd.* (D.D.C. 1984) 588 F.Supp. 749, 757.)

letter concluded with the opinion that, absent a direct conflict, federal regulation will not preempt state law with respect to service corporations.

From the foregoing we conclude that neither Congress nor the Bank Board intended that federal law preempt state law claims against service corporations absent an actual conflict. Plaintiffs' claims against Glenfed Brokerage were therefore improperly dismissed below.

### 2. Claims Against the Bank

■ As noted by the court in *Wisconsin League of Financial Inst. Ltd.* v. *Galecki* (W.D.Wis. 1989) 707 F.Supp. 401, 404, "There is nothing ambiguous about the intent of the Federal Home Loan Bank Board to preempt state laws governing the operations of federal savings institutions." The *Galecki* court went on to state that ". . . the structure of the present regulations makes it apparent that the preemption expressed in § 545.2 extends to all operations of federal savings institutions whether or not the regulations substantively regulate that aspect of the operations." (*Id.* at p. 405.) Thus, ". . . it is clear that any state law 'purporting to address the subject of the operations' of a federal association is preempted by the . . . regulations." (*Federal Sav. and Loan Ins. Corp.* v. *Kidwell* (N.D.Cal. 1989) 716 F.Supp. 1315, 1316, vacated in part on other grounds (9th Cir. 1991) 937 F.2d 612.) ■ The question thus presented is whether the causes of action alleged in the complaint "purport to address the subject of the operations" of the Bank.

Two recent California Court of Appeal decisions have concluded that the preemptive language of 12 Code of Federal Regulations section 545.2 (1995) did not preclude prosecution of the causes of action presented therein. Thus, in *Siegel* v. *American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953 [258 Cal.Rptr. 746], the Court of Appeal determined that a savings association's practice of collecting reconveyance fees in violation of the California Civil Code was not expressly preempted by 12 Code of Federal Regulations section 545.2. In reaching this conclusion, the court stated that "The [Bank] Board is capable of saying it means to expressly preempt all state law in an area. In enacting the due-on-sale regulations, 12 Code of Federal Regulations, section 545.8-3(f), the Board in a preamble expressed its intent 'that the due-on-sale practices of federal savings and loans be governed "exclusively by Federal law." [Citation.] The Board emphasized that "[f]ederal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements."' (*Fidelity Federal Sav. & Loan Assn.* v. *De la Cuesta* (1982) 458 U.S. 141, 147 [73 L.Ed.2d 664, 671, 102 S.Ct. 3014].) [¶] Section 545.2 contains no such statement that

federal law is preemptive of all state common law claims. Indeed, the fact that such preemption language appears in the due-on-sale regulation suggests that the Board does not believe it has passed a regulation preempting all state laws which affect federally chartered associations." (*Siegel* v. *American Savings & Loan Assn.*, *supra*, at pp. 960-961.)

The *Siegel* court also held that the state law claims were not impliedly preempted by the Bank Board's occupation of the field. In this regard, it relied on the Supreme Court's discussion in *de La Cuesta*, where the court stated: "As we noted above a savings and loan's mortgage lending practices are a critical aspect of its 'operation,' over which the Board unquestionably has jurisdiction. Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion." (*De La Cuesta*, *supra*, 458 U.S. at p. 167 [73 L.Ed.2d at p. 684].) Thus, the United States Supreme Court expressly suggested that Congress may not have occupied the entire field of operations of savings associations. The *Siegel* court noted as well that recent cases narrowly define the field subject to implied preemption. Under these circumstances, the *Siegel* court concluded that the plaintiff's claims were not preempted. (*Siegel* v. *American Sav. & Loan Assn.*, *supra*, 210 Cal.App.3d. at pp. 961-964.)

Likewise, in *People* ex rel. *Sepulveda* v. *Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692 [19 Cal.Rptr.2d 555], the Court of Appeal rejected the association's defense of preemption to plaintiffs' fraud claims in connection with the association's beneficial ownership of certain slum dwellings. The gravamen of the complaint, like the complaint in the instant case, charged the association "with engaging in unfair business practices and fraud for the purpose of maximizing its profits." The association allegedly committed these illegal activities through fraudulent loan transactions. (*Id.* at p. 1700.)

While the challenged conduct of the association in *Sepulveda* included aspects of the association's lending practices, the Court of Appeal stated "we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA." (14 Cal.App.4th at p. 1708.) The court also found no implied preemption, reasoning that "The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. . . . The remaining

causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA." (*Id.* at p. 1711.)

The court continued: ". . . we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims." (14 Cal.App.4th at p. 1712.) The plaintiff merely seeks redress of "the wrongful conduct of an entity, inter alia, which just happens to be a federal association." (*Ibid.*)

Plaintiff urges us to adopt the rationales of *Siegel* and *Sepulveda* to find no preemption, while the Bank seeks to distinguish these cases from the instant case. However, we do not find *Siegel* and *Sepulveda* particularly helpful to our analysis. Both cases concluded that the federal regulations neither expressly nor impliedly preempted state law, and concluded that the prosecution of the plaintiffs' causes of action resulted in no conflict with the regulations, and thus were not preempted. The question with which we are faced here, however, is whether plaintiff's lawsuit for fraud, negligent misrepresentation (which is, of course, a species of fraud), and unfair and deceptive business practices in effect regulates the "operations" of a savings association. We conclude that it does not.

Plaintiff's complaint alleges that the Bank, in soliciting the sale of securities, engaged in deceptive advertising practices, intentionally or negligently made material misrepresentations and omissions, and engaged in other misleading and deceptive acts, causing plaintiff and the class to "believ[e] that the GlenFed Brokerage employees they were dealing with were Glenfed Bank employees and that the mutual funds or other securities purchased had substantially the same safety features as a federally insured Certificate of Deposit." Plaintiff further alleged that he and the class were misled by the Bank's deceptive advertising and reasonably relied on the Bank's misrepresentations and omissions, all to their detriment.

As the *Siegel* court noted, actions for fraud are governed almost exclusively by state law, and do not raise issues of great federal interest. (*Siegel* v. *American Savings & Loan Assn.*, *supra*, 210 Cal.App.3d at p. 962.) There is no reason to suppose that Congress intended to preempt common law tort claims, effectively granting savings associations immunity from such state

law claims, and a number of courts have so held. (See, e.g., *Honig* v. *Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965 [7 Cal.Rptr.2d 922]; *Hall* v. *Great Western Bank* (1991) 231 Cal.App.3d 713, 721-722 [282 Cal.Rptr. 640]; *Siegel* v. *American Savings & Loan Assn.*, *supra*, at p. 962; *Flanagan* v. *Germania, F.A.* (8th Cir. 1989) 872 F.2d 231, 234; see also *Solorzano* v. *Superior Court* (1992) 10 Cal.App.4th 1135, 1146-1149 [13 Cal.Rptr.2d 161].) And the Bank's argument that, by permitting fraud and unfair trade practices suits, the state is regulating the Bank's conduct, is off the mark. Plaintiff's ability to sue the Bank for fraud does not interfere with what the Bank may do, that is, how it may conduct its operations; it simply insists that the Bank cannot misrepresent how it operates, or employ fraudulent methods in its operations.[5] Put another way, the state cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Bank chooses to operate, it do so free from fraud and other deceptive business practices.

Consequently, we conclude that plaintiff's causes of action against the Bank are not preempted by federal regulations. The trial court therefore erred in dismissing these claims on federal preemption grounds.

### 3. *The Claims Against the Bank's Former and Current Parent Corporations*

Because we have concluded that plaintiff's suit against the Bank is not preempted, plaintiff's claims against Glenfed, Inc., and Glendale Investment Corporation are likewise not preempted. Since federal preemption was the sole ground for dismissing the lawsuit against Glenfed, Inc., and Glendale Investment Corporation, the judgments in favor of these two defendants must be reversed.

### DISPOSITION

The judgment is reversed. Plaintiff to recover his costs of appeal.

Turner, P. J., and Godoy Perez, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 28, 1996.

---

[5]Neither does plaintiff's suit seek to regulate behavior which conforms to the federal statutes and regulations to which the Bank is subject.